FILED

05/16/2017

Clerk of the
Appellate Courts



# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs February 23, 2017

## STATE OF TENNESSEE v. PATRICK RUSSELL CHAMBERS

**Appeal from the Circuit Court for Blount County**
**Nos. C-24053, C-20398        David R. Duggan, Judge**

_____

## No.  E2016-01324-CCA-R3-CD
_____

The Defendant, Patrick Russell Chambers, pleaded guilty in the Blount County Circuit Court in case number C-24053 to possession of contraband inside a penal institution, a Class C felony.  *See* T.C.A. § 39-16-301 (2014).  The Defendant also stipulated that his conduct in case number C-20453 violated the conditions of his community corrections sentence relative to a reckless homicide conviction in case number C-20398.  The trial court sentenced the Defendant as a Range III, persistent offender to ten years' confinement for the contraband conviction and to serve the remainder of his eight-year sentence for the reckless homicide conviction after finding that the Defendant had violated the conditions of his release.  On appeal, the Defendant contends that the trial court erred in denying his request for alternative sentencing.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Michael R. Tabler, Knoxville, Tennessee, for the appellant, Patrick Russell Chambers.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Mike L. Flynn, District Attorney General; and Tracy Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On November 5, 2015, the Defendant was arrested for possession of various narcotics when he was inside the booking area of the jail.  As a result of the criminal charge, a community corrections violation report and an arrest warrant for the violation

were issued on November 16. The warrant stated that on October 14, 2015, the Defendant was convicted of reckless homicide and sentenced to eight years, with six months' confinement and the remainder to be served on community corrections.

On March 28, 2016, the Defendant pleaded guilty to the contraband-related charge and to the community corrections violation. Pursuant to the plea agreement, the trial court would determine the length and manner of service of the sentence relative to the contraband conviction and determine the disposition of the community corrections violation. The transcript of the guilty plea and the community corrections submission hearing is not included in the appellate record.

At the June 20, 2016 sentencing hearing, the presentence report was received as an exhibit. The report shows previous convictions for six counts of aggravated assault, four counts of reckless endangerment involving a deadly weapon, a federal drug-related conviction, misdemeanor drug possession, and various traffic-related offenses. The forty-four-year-old Defendant graduated from high school, earned carpentry-related certificates during a previous period of confinement, and served in the military.

The Defendant reported good mental and physical health and indicated he had been previously diagnosed with bipolar disorder, although he was not taking prescription medication. The Defendant reported first drinking alcohol at age thirteen, using marijuana between ages sixteen and forty-four, weekly use of cocaine between ages twenty-one and thirty-seven, abusing prescribed hydrocodone, and using oxycodone and morphine at age thirty-eight until his incarceration in this case. The Defendant reported using oxycodone and morphine when he reported to the jail to begin serving his six months' confinement relative to the reckless homicide conviction.

The Defendant reported that on the day he was to report to the jail, he made the decision to stop taking his prescribed pain medication and that he was going to experience "extreme" withdrawal because of stopping his medications "cold turkey." He said he had never experienced these symptoms and made the decision to bring medications into the jail to lessen the effects of the symptoms. He said that if he had been "in his right mind," he would have never introduced contraband into the jail.

The Defendant reported earning an athletic scholarship to a Texas college but left school after four months to join the Army. The Defendant completed boot camp and returned home to marry his girlfriend, although the marriage only lasted one year. The Defendant said he obtained a "hardship" discharge from the Army in order to assist his father in caring for his ill mother. The Defendant ultimately fathered a child with another woman, and the child was age six at the time of the presentence investigation. The child was in the custody of the Defendant's father as a result of the reckless homicide conviction and because of the child's mother's prescription medication abuse. The

Defendant pleaded guilty to reckless homicide in exchange for serving six months in confinement and eight years on community corrections. The Defendant admitted he possessed Suboxone and Xanax when he entered the jail to begin serving the six months.

Robert White testified that he represented the Defendant in the reckless homicide case. Mr. White said that he spoke to the Defendant on the day the Defendant reported to the jail and that the Defendant was frantic and distraught. Mr. White said that the Defendant expressed concerns relative to suffering withdrawal from the pain medication the Defendant was taking at the time. Mr. White recalled that the Defendant was at a hospital or planning to go the hospital in an effort to obtain assistance with the symptoms. Mr. White said that the Defendant requested Mr. White to attempt to reschedule his report date and that the Defendant sounded desperate. Mr. White said that he contacted the district attorney's office to discuss rescheduling the report date but that he was unable to speak with the assigned prosecutor. Mr. White said he told the Defendant that he was unable to reschedule the report date.

On cross-examination, Mr. White testified that the Defendant was scheduled to report to the jail on November 3, 2016. He acknowledged the allegation relative to the reckless homicide charge was that the Defendant had a problem with drugs and agreed the four-year-old victim died as a result of the Defendant's "smothering him to death in bed" while under the influence of "illicit drugs." Although the offense occurred in 2010, Mr. White did not know what, if any, drug treatment the Defendant sought after the incident.

On redirect examination, Mr. White testified that he and the Defendant discussed the Defendant's plan to address the withdrawal the Defendant would experience when the Defendant reported to the jail. Mr. White said the Defendant planned to decrease the amount of medication he took in anticipation of the report date.

The Defendant testified that his childhood was stable with loving parents. He said that he played youth sports, including football, and recalled that he was player of the year and that he obtained a collegiate athletic scholarship. He said that after he injured his arm in college, he left school to join the Army. The Defendant acknowledged he was arrested while in the Army for being absent without leave but said the military panel determined that he was not absent without leave and returned him to his station.

The Defendant testified that he returned home from the Army to care for his ill mother who suffered from kidney disease and was unable to walk. The Defendant said he obtained a job and supported himself financially. He said that his mother died in 1993, that her death was difficult, and that he began using cocaine daily. He admitted he used cocaine to prevent having to address his grief. Relative to his federal cocaine-related conviction, he said that he became involved in selling cocaine to support his

personal habit. He said that he was sentenced to twelve months in a halfway house, three years on probation, and community service. He said that he encountered no problems while on probation and that he successfully completed his probation and community service.

The Defendant testified regarding his continuous employment history through 1999 and the completion of his federal sentence. He said that in 1999, he and his then-girlfriend married, and he described the marriage as good initially. He recalled maintaining his sobriety during that time but said his wife began secretly using drugs. He recalled his wife's entering a rehabilitation program but said she did not maintain her sobriety after finishing the program. He said that she relapsed after one or two weeks and that on the same day as her relapse, he was involved in a serious traffic accident, which resulted in a seventeen-count indictment. He said that he pleaded guilty to aggravated assault and that he received a six-year sentence in confinement. He and his wife divorced while the Defendant was in confinement.

The Defendant testified that while he was serving his six-year sentence, he took classes related to residential construction, worked in the job coordinator classification office, and wrote for the prison newspaper. He said that later he was approved to work at the State Capitol based upon his good behavior and low-risk security classification. He said that he registered for the prison anger management and substance abuse class but that the waiting list was too long and that he was unable to participate in the program before his February 2007 release. He said that he was on parole for five months, that he worked in the construction industry, and that he had no problems during his parole. He said that he worked in Mississippi as a subcontractor after Hurricane Katrina. He said he injured his hand severely, that his knuckles were broken, that he was prescribed pain medication, and that he ultimately became addicted to the medication. He said that he discussed the increased pain in his hand with his doctor and that the dosage of pain medication became large over time. He said that he returned to Tennessee and that his Tennessee doctor prescribed a stronger pain medication. The Defendant recalled that the progression of medication began with Percocet and increased to Roxicodone coupled with morphine. He said he attempted to take his medication as prescribed.

The Defendant testified that in 2009, he missed a scheduled court appearance for a traffic citation and that he was arrested. He admitted that he possessed cocaine when he was taken to jail and said that he pleaded guilty to misdemeanor possession and was sentenced to eleven months, twenty-nine days' probation. He said that he completed his probation without issue, that he passed routine drug screens, and that his doctor continued prescribing the pain medications. He said that none of his doctors expressed concern regarding the amount of medication he was prescribed.

-4-

The Defendant testified that in 2009, he began a romantic relationship with Lauren Free, that Ms. Free had a ten-month-old son at that time, and that the son was the victim in the reckless homicide conviction. The Defendant said that he and the victim had a wonderful relationship and noted the victim's biological father was not a part of the victim's life. The Defendant said he was a father figure and cared for the child as though he were the victim's father. The Defendant said he enjoyed spending time with the victim and recalled the victim "wanted to be right beside" the Defendant. He said that Ms. Free and the victim moved into his home in February. He said that at this time, he worked and took pain medication. He thought he took about six to nine Roxicodone tablets per day, which was consistent with his prescription.

The Defendant testified relative to the reckless homicide conviction that he put the victim to bed and that he slept in the bed with the victim, as was the usual practice. The Defendant said Ms. Free woke him because he was lying on the victim. The Defendant recalled that the victim was unresponsive, that paramedics responded, and that the victim was pronounced dead at the hospital. He said that he was charged in relation to the victim's death on the State's allegation that he exceeded the amount of prescribed pain medication. He said that he pleaded guilty to reckless homicide and noted that the victim trusted him and that he failed the victim. He said that he did not know how to deal with "losing a kid" and that it had been difficult.

The Defendant testified that he and Ms. Free had a child together, that the child was age six at the time of the sentencing hearing, and that the Defendant's father obtained custody of the child on the day of the victim's death. The Defendant said that when the victim died, he did not care if he lived or died, that his prescription use "became worse," and that he took more medication than he was prescribed. He said he did not want to think about what had happened.

The Defendant testified that although he initially did not think he had an addiction to pain medication, he realized he had been addicted since before the victim's death. He thought that he was in control and that he could stop taking the medication but admitted he was wrong. He said that although he and Ms. Free were never the same after the victim's death, they stayed together.

The Defendant testified that he continued using his prescribed pain medication after he pleaded guilty to reckless homicide, that he called Mr. White to discuss his medication use the day before the Defendant was scheduled to report to the jail, and that the Defendant told Mr. White that he was going to stop taking the medication "cold turkey" because he thought he was in control. The Defendant said he stopped taking his medication the night before he reported to the jail and that he began experiencing extreme withdrawal. He said that the symptoms were overwhelming, that he contacted Mr. White, and that he wanted to know from Mr. White if he could enter a rehabilitation

program or delay the report date. The Defendant said that Mr. White was unable to delay the report date and that the Defendant went to the hospital to obtain treatment for the symptoms. He said the doctor prescribed stomach medication but could not relieve the symptoms. The Defendant agreed that after he left the hospital, he decided to bring Suboxone and Xanax to the jail. He said that he experienced "full withdrawal" while inside the jail and that he had never discussed addiction with anyone. He said, though, he understood he was an addict and that he wanted to obtain treatment.

The Defendant testified that he wanted to live "a clean life" and that he did not want his son "to go down this path." He said that if the trial court approved, he would enter an inpatient rehabilitation program, an intensive outpatient program, obtain individual counseling, and attend Narcotics Anonymous meetings. The Defendant said that he began attending Narcotics Anonymous four weeks before the sentencing hearing and that it was helpful to learn a person could "get clean and stay sober." He said that although he was not eligible for the drug court program, he was evaluated by the Helen Ross McNabb Center and that the staff would facilitate "funding and find[] treatment" if necessary.

The Defendant apologized to the trial court for wasting its time because the Defendant knew better. The Defendant said that if the court provided the opportunity, he would complete his community corrections without incident and remain sober. He noted that it had been six years since the victim's death and that he still did not know what to say about the victim's death. The transcript reflects the Defendant began to cry and said he loved the victim very much and wished he could change the past.

On cross-examination, the Defendant testified that he had struggled with addiction before his 1997 federal conviction and that his problems began around the time of his mother's death. He agreed, though, that not everyone who suffered the loss of a parent became addicted to drugs. Relative to his previous convictions, he said he accepted responsibly for his conduct and pleaded guilty.

The Defendant testified that at the time of the victim's death in the reckless homicide conviction, he received his pain medication from a Maryland doctor and that he did not know the doctor was later convicted in federal court relative to the doctor's pain medication prescribing practices. He said that he sought treatment in Maryland while he was traveling for work and that he did not obtain simultaneous prescriptions from his Tennessee doctor during that time.

The Defendant testified that he did not possess valid prescriptions for Suboxone and Xanax when he entered the jail. He said that he was asking the trial court for help to address his addiction and that he had not sought help previously because he did not think he needed help.

Larry Chambers, the Defendant's father, testified relative to the reckless homicide conviction that the Defendant was the victim's father figure, that the Defendant loved the victim, and that the victim referred to the Defendant as "Daddy." Mr. Chambers recalled that the Defendant and the victim were inseparable and that the Defendant "broke down" anytime the victim was mentioned. Mr. Chambers said he knew the Defendant felt remorse for the victim's death.

Mr. Chambers testified that he adopted the Defendant's and Ms. Free's child and that Mr. Chambers told the Defendant that the Defendant would not be a part of the child's life if the Defendant did not address his addiction and remain sober. Mr. Chambers believed that the Defendant was ready to address his addiction and obtain treatment. He said the Defendant was hardworking and cared for other people.

Casey Corsentino testified that he was the Defendant's former employer and that they were friends. He said that the Defendant was an outstanding and reliable employee and that he would hire the Defendant again. Mr. Corsentino said that the Defendant never discussed his addiction or criminal history and that learning of the Defendant's previous convictions did not impact his opinion of the Defendant.

The trial court stated that it believed the Defendant understood addiction was terrible, drugs were destructive, and terrible things happened when drugs were involved. The court found that the Defendant was not using his addiction to excuse his conduct and that the Defendant simply told his life story at the hearing. The court found that the Defendant never wanted to hurt the victim in the reckless homicide case and that the Defendant was remorseful for the child's death.

The trial court found that the Defendant's drug addiction led him to make the "stupid" decision to report to jail with drugs and that the Defendant regretted the decision, although the Defendant deliberately chose to enter the jail with contraband. The court discussed its functions of sentencing defendants and of assisting defendants, in some instances, in obtaining drug treatment.

The trial court stated that in determining the Defendant's sentence, it had considered the sentencing hearing evidence, the presentence report, the principles of sentencing, counsels' arguments, the nature of the Defendant's conduct, statistical information from the Administrative Office of the Courts, the Defendant's statements at the sentencing hearing, and the Defendant's potential for rehabilitation.

Relative to mitigating factors, the trial court found that the Defendant's conduct did not cause or threaten to cause serious bodily injury. *See* T.C.A. § 40-35-113(1) (2014) ("The defendant's criminal conduct neither caused nor threatened serious bodily

injury[.]"). The court found, though, that the Defendant's suffering from withdrawal as a reason for the Defendant's conduct was not a mitigating factor.

The trial court found that enhancement factors (1) and (13) applied. *See id.* § 40-35-114(1), (13) (2014). The court found that the Defendant had a previous history of criminal convictions and behavior in addition to those necessary to establish the sentencing range. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court found that at the time the Defendant introduced contraband into the jail, he was serving a sentencing on probation. *See id.* § 40-35-114(13)(C) ("At the time the felony was committed . . . the defendant [was] . . . [r]eleased on probation[.]").

The trial court stated relative to alternative sentencing that it had considered the presentence report, the Defendant's physical and mental condition, the Defendant's social history, the Defendant's history of drug abuse, the circumstances of the contraband-related offense and the community corrections violation, and the Defendant's previous criminal history and likelihood of rehabilitation. The court found that the Defendant had accomplished good things in his life and that the Defendant wanted to "get clean." The court stated that despite the Defendant's extensive criminal history, the Defendant's potential for rehabilitation was "better than it otherwise would be" because the Defendant was sober as a result of his incarceration. The court stated that it could not find that the Defendant's potential for rehabilitation was good. The court found that whether the Defendant committed future criminal offenses and whether he could be rehabilitated depended upon the Defendant's sobriety, regardless of the sentence imposed.

The trial court expressed ambivalence about whether the Defendant could comply with the conditions of probation because the Defendant was serving a sentence on community corrections when he entered the jail with drugs, almost immediately after pleading guilty to reckless homicide. The court was unable to find that the Defendant would abide by the terms of an alternative sentence. The court found that the need to protect society from the Defendant's future criminal conduct depended upon the Defendant's ability to maintain his sobriety. Relative to previous sentences other than confinement, the court found that the Defendant violated his community corrections sentence by committing the present offense. The court stated that it had considered whether an alternative sentence would depreciate the seriousness of the offense and found that the offense was not particularly heinous.

The trial court stated that in deciding whether to order the Defendant's sentence in confinement, it placed emphasis on whether confinement was necessary to protect society from the Defendant's future criminal conduct, whether confinement was necessary to

avoid depreciating the seriousness of the offense, and whether measures less restrictive than confinement had frequently or recently been applied unsuccessfully.

The court found relative to the community corrections violation that the Defendant committed a "material violation," noted the Defendant's stipulating to his violating the conditions of his release, and ordered the Defendant to serve the remainder of his sentence in the reckless homicide case. Relative to the contraband conviction, the court sentenced the Defendant as a Range III, persistent offender to ten years' confinement. The court declined to order consecutive service. The court addressed the Defendant, stating that the Defendant had the opportunity for parole and that the Defendant could "put this behind" him to the extent he obtained additional treatment for his addiction. The court stated that it believed the Defendant could live a productive life. This appeal followed.

The Defendant contends that the trial court abused its discretion by denying his request for alternative sentencing. He argues that confinement is not the least severe measure necessary to achieve the purposes for which the sentence was imposed and that confinement is not meant to prevent crime and to promote the respect of law. He also argues that when a defendant's criminal history is "closely tied to drug addiction and mental health issues" but treatment has never been attempted, confinement cannot be the least severe measure necessary to achieve the purposes and principles of sentencing. The State responds that the trial did not abuse its discretion.

## Contraband Conviction

This court reviews challenges to the length and manner of service of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of

an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The standard of review for questions related to probation or any other alternative sentence, including community corrections, is an abuse of discretion with a presumption of reasonableness for within-range sentences reflecting a decision based upon the principles and purposes of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant who is ineligible for probation might still be a candidate for community corrections. *Id*. § 40-36-106(a)(1)(A) (2014); *see State v. Kendrick*, 10 S.W.3d 650 (Tenn. Crim. App. 1999). A defendant who is a felony offender and would otherwise be unfit for probation due to a history of drug or alcohol abuse or mental health problems and "whose special needs are treatable and could be served best in the community rather than in a correctional institution" may be eligible for community corrections. T.C.A. § 40-36-106(c) (2014). The burden of establishing suitability for an alternative sentence rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Russell*, 773 S.W.2d 913, 915 (Tenn. 1989).

The record reflects that the trial court extensively considered the purposes and principles of sentencing in determining whether the Defendant would receive the benefit of an alternative sentence. The court considered the presentence report, the Defendant's mental and physical condition, the Defendant's social history, the circumstances of the community corrections violation and the contraband offense, and the Defendant's previous criminal history and potential for rehabilitation. The court found that the Defendant's sobriety was the result of his confinement since violating his community corrections sentence and that the Defendant's potential for rehabilitation was better than it otherwise would have been. The court, though, did not find that the Defendant's potential for rehabilitation was good. The court noted that the Defendant's ability to rehabilitate, his likelihood of committing future criminal offenses, and the need to protect the public from the Defendant's future conduct depended upon his ability to maintain his sobriety.

Additionally, the record supports the trial court's finding that the Defendant was serving his reckless homicide conviction on community corrections at the time he committed the contraband offense, shortly after pleading guilty to reckless homicide. As a result, the trial court found that the Defendant would not abide by the terms of another

alternative sentence. The record reflects that the Defendant had previously received the benefit of parole and probation but continued to commit additional criminal offenses. The Defendant violated the terms of his release by entering the jail with contraband. In ordering the Defendant to serve his sentence in confinement, the trial court placed emphasis on the need to protect society from the Defendant's future criminal conduct, the need to avoid depreciating the seriousness of the offense, and the Defendant's having violated the conditions of his release. *See id*. § 40-35-103(1)(A)-(C).

The trial court expressed empathy regarding the Defendant's addiction but found that the Defendant's addiction led him to commit yet another criminal offense, despite the role his addiction played in his extensive criminal history and in the death of a young child. The Defendant failed to establish his suitability for an alternative sentence, and the trial court did not err by ordering the Defendant to serve his sentence in confinement.

## Revocation of Community Corrections

A trial court may revoke a defendant's probation upon its finding by a preponderance of the evidence that the defendant violated a condition of the sentence. T.C.A. § 40-35-311(e) (2014) (prescribing the procedure for probation revocation proceedings). Given the similar nature of a sentence of community corrections and a sentence of probation, the same principles are applicable in deciding whether the revocation of a community corrections sentence is proper. *State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991). Our supreme court has concluded that a trial court's decision to revoke a defendant's community corrections sentence "will not be disturbed on appeal unless . . . there has been an abuse of discretion." *Id.* at 82 (citing *State v. Williamson*, 619 S.W.2d 145, 146 (Tenn. Crim. App. 1981)). An abuse of discretion has been established when the "record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980); *see State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

When a trial court finds by a preponderance of the evidence that a defendant has violated the conditions of probation, the court "shall have the right . . . to revoke the probation." T.C.A. § 40-35-311(e)(1) (2014). "In probation revocation hearings, the credibility of witnesses is for the determination of the trial judge." *Carver v. State*, 570 S.W.2d 872, 875 (Tenn. Crim. App. 1978) (citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)). When a defendant's community corrections sentence is revoked, the court "may resentence the defendant to any appropriate sentencing alternative, including

incarceration, for any period of time up to the maximum sentence provided for the offense committed." T.C.A. § 40-36-106(e)(4) (2014).

To the extent that the Defendant contends that the trial court erred by revoking his community corrections sentence relative to the reckless homicide conviction and by ordering him to serve the remainder of his sentence in confinement, the record reflects that the Defendant pleaded guilty to violating the conditions of his release by bringing narcotics into the jail when he reported to begin serving six months in confinement. Therefore, we conclude that the record supports the trial court's finding that the Defendant violated the conditions of his release and that the court did not abuse its discretion by revoking the Defendant's community corrections sentence. *See id*. § 40-36-106(e)(4). Once the court revoked the Defendant's community corrections sentence, it had the authority to order the Defendant to serve the remainder of his sentence in confinement. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE